

## Fourth Court of Appeals
### San Antonio, Texas

**OPINION**

No. 04-23-00497-CV

**IN THE INTEREST OF A.N.C.**, a Child

From the 407th Judicial District Court, Bexar County, Texas
Trial Court No. 2021-PA-01167
Honorable Tina Torres, Judge Presiding

Opinion by:    Patricia O. Alvarez, Justice

Sitting:    Patricia O. Alvarez, Justice
Irene Rios, Justice
Liza A. Rodriguez, Justice (not participating)

Delivered and Filed: October 31, 2023

AFFIRMED

Appellants Mom and Dad appeal the trial court's order terminating their parental rights to their child, A.N.C.[1]  They both assert that trial commenced after the statutory deadline for automatic dismissal passed.  They argue that the verdicts against them are void.

Appellant Mom asserts that, if the verdicts are not void, the evidence is neither legally nor factually sufficient to support the statutory ground for termination.  They both assert that the evidence did not support the jury's best interest finding against them.  Mom argues that if we reverse and remand, then we should also revisit her conservatorship status.  Lastly, Mom argues that she suffered an unfair surprise at trial due to late witness disclosure by the Department.

For the reasons given below, we affirm the trial court's order.

---

[1] To protect the minor's identity, we refer to Mom, Dad, and the child using aliases.  *See* TEX. R. APP. P. 9.8.

## BACKGROUND

The Department first became involved with A.N.C.'s family after one of their children had to be taken to the hospital for head swelling. The injured child was two months old at the time, and A.N.C. was not born yet. When the injured child was treated at the hospital, the parents were interviewed by law enforcement. Dad stated he did not know what happened but suspected that a birth defect led to the child's injury. Mom also provided no explanation, except that A.N.C. was "born that way." The parents took their injured child home from the hospital and returned for a follow-up appointment nearly two weeks later. A doctor's evaluation of the child revealed rib fractures that led to a credible suspicion of abuse.

Dad was on probation for domestic violence. Around the same time, he tested positive for methamphetamines. The children were removed from their parents while the parents worked towards reunification. The parents struggled to engage with services. Dad was not supposed to stay with Mom, but he did anyway, and Mom lied about it to her caseworker. Mom was also pregnant with A.N.C. at the time, though she denied her pregnancy to the caseworker.

In June 2021, A.N.C. was born. At that point, his parents were failing in their service plans with the Department. On July 2, 2021, the Department filed a petition for protection of A.N.C., and the trial court granted the Department's request for temporary managing conservatorship the same day. A.N.C. was two weeks old at the time.

The Department set a goal of reunification for A.N.C. with his parents and created service plans for the parents to complete. But after six months, both parents were failing their service plans, and the Department changed its goal for A.N.C. from reunification to termination of his parents' parental rights.

A.N.C.'s case was originally meant to be completed within a year, but the case was extended, and trial was delayed. By the time trial began, the parents had been working towards

completing their services for over a year. They managed to complete most of their service requirements by the time a jury was impaneled in their case, but the parents' caseworker felt that they had not demonstrated an ability to provide a safe and stable home for A.N.C.

The jury was charged with deciding whether each parent complied or failed to comply with their family service plans, and if they failed, whether it was in A.N.C.'s best interest for their parents' parental rights to be terminated. The jury terminated Mom's and Dad's parental rights. Mom and Dad appealed, arguing that the evidence did not support the verdict and that the case exceeded the statutory time limit for the trial to proceed at all.

### JURISDICTION TO TERMINATE THE PARENTS' RIGHTS TO THEIR CHILD

**A.      Parties' Arguments**

Mom and Dad argue that the trial court lost jurisdiction by failing to meet the statutory deadline to commence trial. They claim that Mom timely requested a jury trial but that no jury was impaneled by the jurisdictional cutoff date. According to Mom and Dad, the trial could not have commenced without an impaneled jury.

The Department argues that Mom and Dad waived their jurisdictional issue by not objecting to the continuation of trial proceedings on December 12, 2022. In the alternative, the Department argues that trial commenced by the December 31, 2022 deadline.

**B.      Jurisdictional Background**

The Department's parental rights termination case for A.N.C began with the filing of its petition for protection on July 2, 2021. This meant that the case needed to be concluded by July 4, 2022, if the trial court did not find that the interests of justice required an extension. *See* TEX. FAM. CODE ANN. § 263.401(a). On April 13, 2022, the trial court issued an order setting a trial date of April 19, 2022.

On April 20, 2022, the trial court issued an order extending statutory dismissal date to December 31, 2022. *See* TEX. FAM. CODE ANN. § 263.401(b). In its order, the trial court stated, in relevant part:

1. Pursuant to § 263.401(b), Texas Family Code, the Court finds that this Court has continuing jurisdiction of this suit, and that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the Department and that continuing the appointment of the Department as temporary managing conservator is in the best interest of the child. An order to retain the case on the Court's docket should be granted.

2. Pursuant to § 263.401(b)(2), Texas Family Code, the Court has considered whether a parent made a good faith effort to successfully complete a court ordered substance abuse treatment program.

3. Pursuant to § 263.401(b-3), Texas Family Code, the Court finds that a parent of a child has made a good faith effort to successfully complete the service plan but needs additional time; and on completion of the service plan the Court intends to order the child returned to the parent.

Trial was reset to August 16, 2022. A week later, it was reset to October 7, 2022.

On October 7, 2022, all parties were present and announced "ready." The trial court stated, "We're going to go forward," and proceeded to swear in the witnesses. Counsel for A.N.C. then invoked the rule to exclude witnesses who were expected to be called during the trial. The parties identified the witnesses they expected to call. The trial court asked the Department who was its first witness, and the Department replied that it was its medical expert. But before any examination began, attorneys for both parents objected to the Department's expert testifying based on inadequate discovery. The trial court halted proceedings and ordered the Department to complete its expert witness discovery by October 14, 2022. The trial court then continued the proceedings to December 2, 2022.

On November 1, 2022, Mom requested a jury trial. On November 9, 2022, the trial court granted her request and set jury trial proceedings for December 12, 2022. On December 12, 2022, the trial court called the case and went directly into pretrial matters. It ruled on motions in limine

and then discussed peremptory strikes with the parties. The trial court also considered the matter of the Department's untimely designation of its expert witness, Dr. Spiller. Also, in the afternoon, the trial court heard the motion to prohibit the use of evidence from a prior case. At the end of the day, the cause was reset to February 21, 2023. Before the hearing adjourned, the trial court made a finding that trial had commenced.

On February 21, 2023, Mom filed a plea to the jurisdiction based on trial scheduling issues. She argued that the case had continued past its automatic dismissal date of December 31, 2022, and that the trial court had lost jurisdiction. The trial court denied Mom's plea to the jurisdiction, because 1) parties had announced ready and witnesses were sworn in for trial on October 7, 2022, and 2) the trial court ruled on motions in limine on December 12, 2022.

On February 22, 2023, parties selected a jury, and trial proceeded through March 2, 2023.

Now, on appeal, we address Mom's and Dad's arguments that the trial court did not have jurisdiction to move forward with trial proceedings.

**C.      Law**

Under Texas Family Code section 263.401, a parental rights termination trial must commence before its dismissal deadline. *See* TEX. FAM. CODE ANN. § 263.401; *In re H.B.C.*, No. 05-19-00907-CV, 2020 WL 400162, at *12 (Tex. App.—Dallas Jan. 23, 2020, no pet.) (mem. op.); *In re K.B.*, No. 09-19-00239-CV, 2019 WL 6598618, at *3 (Tex. App.—Beaumont Dec. 5, 2019, no pet.) (mem. op.). If it does not, the case is automatically dismissed for want of jurisdiction. *See* TEX. FAM. CODE ANN. § 263.401; *In re H.B.C.*, 2020 WL 400162, at *12; *In re K.B.*, 2019 WL 6598618, at *3.

*1.   Waiver Does Not Apply*

The Department argues that Mom and Dad were required to object to the trial court's continuation of trial proceedings to preserve their jurisdiction issue on appeal. We disagree. "In

2017, the Texas Legislature amended sections 263.401 and .402. In the amended version of section 263.401, if the trial does not commence timely, then the trial court loses jurisdiction over the case and the case is 'automatically dismissed.'" *In re E.P.S.*, No. 05-19-01125-CV, 2020 WL 772832, at *3 (Tex. App.—Dallas Feb. 18, 2020, pet. denied) (citing Act of May 26, 2017, 85th Leg., R.S., ch. 317, §§ 27, 28, 2017 Tex. Gen. Laws 612, 620–21; Act of May 28, 2017, 85th Leg., R.S., ch. 319, §§ 12, 13, 2017 Tex. Gen. Laws 713, 718–719). Here, because the Department's petition was filed after 2017, Mom and Dad were not required to object to the continuation of trial to preserve their jurisdictional issue under Texas Family Code section 263.401. *See id*. (citing TEX. FAM. CODE ANN. § 263.402(b); *In re M.T.R.*, 579 S.W.3d 548, 564 (Tex. App.—Houston [14th Dist.] 2019, pet. denied)). Waiver does not apply.

### 2. Trial Commenced Before the Deadline

Mom and Dad argue that trial did not commence for purposes of section 263.401 because the jury in this case was not impaneled until December 12, 2022. For support, they rely on criminal cases. *See Sanchez v. State*, 138 S.W.3d 324, 329 (Tex. Crim. App. 2004); *McCoslin v. State*, 558 S.W.3d 816, 820 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd); *State v. Cortez*, No. 02-18-00019-CR, 2018 WL 5833431, at *2 (Tex. App.—Fort Worth Nov. 8, 2018, no pet.) (mem. op., not designated for publication). These criminal cases, however, do not apply to parental termination proceedings. *See In re R.J.*, 579 S.W.3d 97, 110 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). In a parental rights termination case, "'commencement of trial' means, at a minimum, that parties have been asked to make their respective announcements, and the trial court has ascertained whether any preliminary matters need to be considered." *Id.* (quoting *In re D.S.*, 455 S.W.3d at 753).

Here, for purposes of section 263.401, trial commenced on October 7, 2022, when the parties announced ready, the trial court stated trial was going forward, the witnesses were sworn

in, and the rule was invoked. The parties then identified for the court whom they intended to call as witnesses. Proceedings were then continued when Mom and Dad objected to the Department's expert testifying. That Mom later requested a jury and the trial court honored her request does not affect the trial court's jurisdiction under section 263.401. Trial had already commenced for purposes of section 263.401. *See In re R.J.*, 579 S.W.3d at 110. We overrule Mom and Dad's jurisdictional issue.

## DISCOVERY

### A. Parties' Arguments

Mom argues that she suffered from an unfair trial by ambush after the trial court permitted certain Department witnesses to testify. Specifically, she argues that Detective Tilson should not have been allowed to state the conclusion of his investigation into A.N.C.'s brother's head injury, i.e., that it was neither natural nor accidental, because Detective Tilson was not disclosed as an expert. She argues that Dr. Spiller, the child abuse pediatrician who examined A.N.C.'s brother, was also not disclosed as an expert and should not have been allowed to testify. She also argues that the Department's custodian of medical records was an undisclosed witness who should not have been permitted to lay the foundation for previously disclosed documents.

The Department argues that Detective Tilson was disclosed as both a fact and expert witness, but that his opinion testimony qualified as lay witness testimony based on his perceptions from his investigation. Overall, the Department argues that the trial court did not abuse its discretion regarding any of the three witnesses Mom complains about.

### B. Standard of Review

"We review a trial court's decision to admit or exclude evidence for an abuse of discretion." *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). "We must uphold a trial court's evidentiary ruling

if there is any legitimate basis in the record to support it." *Spurck v. Tex. Dep't of Family & Protective Services*, 396 S.W.3d 205, 213 (Tex. App.—Austin 2013, no pet.)

**C.      Law**

In general, parties are required to disclose trial witnesses at least thirty days before trial. *See* TEX. R. CIV. P. 194.4(b); *Roberson v. Roberson*, No. 14-22-00171-CV, 2023 WL 5286968, at *1 (Tex. App.—Houston [14th Dist.] Aug. 17, 2023, pet. filed) (mem. op.). For expert witnesses, the deadline for disclosure is 120 days before trial if the party is seeking affirmative relief. *See* TEX. R. CIV. P. 195.2(a); *Ibarra v. City of Laredo*, No. 04-10-00665-CV, 2012 WL 2914216, at *4 (Tex. App.—San Antonio July 18, 2012, no pet.) (mem. op.). Additionally for expert witnesses, parties are required to disclose the subject matter of their testimony and their general impressions and opinions. *See* TEX. R. CIV. P. 195.5;[2] *In re T.K.D-H.*, 439 S.W.3d 473, 478 (Tex. App.—San Antonio 2014, no pet.).

If they fail to make timely disclosures, then the evidence should be excluded, unless "the court finds that: (1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or (2) the failure would not unfairly surprise or unfairly prejudice the other parties." *In re T.K.D-H.*, 439 S.W.3d at 478–79 (citing TEX. R. CIV. P. 193.6(a)(1), (2)); *A.P. v. Tex. Dep't of Family & Protective Services*, No. 03-23-00089-CV, 2023 WL 3956859, at *6 (Tex. App.—Austin June 13, 2023, pet. denied) (mem. op.); *Fox v. Bank of Am., N.A.*, No. 14-15-00955-CV, 2017 WL 626628, at *2 (Tex. App.—Houston [14th Dist.] Feb. 14, 2017, no pet.) (mem. op.). The trial court may also "grant a continuance or temporarily postpone the trial to allow a response to be made, amended, or supplemented, and to allow opposing parties to conduct discovery regarding any new information presented by that response." TEX. R. CIV. P. 193.6(c).

---

[2] Provisions regarding expert disclosures are now found in Texas Rule of Civil Procedure 195.5. Amended by order of Dec. 23, 2020, eff. Jan. 1, 2021.

If the trial court allows untimely disclosed witness testimony over a party's discovery objection but makes no express findings, we will evaluate the trial court's implied findings for an abuse of discretion. *See In re H.A.C.*, No. 06-16-00063-CV, 2017 WL 604064, at *3 (Tex. App.—Texarkana Feb. 15, 2017, no pet.) (mem. op.); *accord Spurck*, 396 S.W.3d at 214. To that end, we note that the "best interest of child may be a factor in trial court's ruling on discovery sanctions." *Spurck*, 396 S.W.3d at 215 (citing *Taylor v. Taylor*, 254 S.W.3d 527, 534 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *In re P.M.B.*, 2 S.W.3d 618, 624 (Tex. App.—Houston [14th Dist.] 1999, no pet.)); *accord In re C.H.*, No. 07–04–0428–CV, 2006 WL 3813751, at *2 (Tex. App.—Amarillo Dec. 28, 2006, no pet.) (mem. op.). "[T]he best interest of a child can only be attained when a court's decision is as well-informed as the circumstances allow." *In re P.M.B.*, 2 S.W.3d at 624–25.

## D. Analysis

Detective Tilson

Detective Tilson was the detective in charge of investigating A.N.C.'s brother's head trauma when it was reported. He interviewed the parents and doctors, and he read the doctors' findings and patrol officers' reports.

Because the report of the child's injury led to his siblings' removals from the home, the Department called Detective Tilson as a witness at A.N.C.'s trial to provide some historical information about the family. The record shows that he was disclosed as a witness for A.N.C.'s trial on July 8, 2022, as the "SAPD SVU Detective who conducted the criminal investigation."

On October 14, 2022, the Department filed a supplemental disclosure and summarized Detective Tilson's anticipated testimony as follows:

> Detective Tilson will testify to his involvement of the case, his encounters of [sic] with Mom and Dad, and his conclusion of the case to [sic] which led to the request for criminal charges.

> Detective Tilson believes that Dad and or Mom are solely responsible for the injuries sustained by [A.N.C.'s brother] due to the child being in their care at the time of injuries.

At trial, Detective Tilson summarized his investigation into A.N.C.'s brother's head trauma. He told the jury that he had closed the investigation because he "couldn't gather enough evidence to establish probable cause to say that either parent had caused the injury."

The Department asked, "[S]o what does that mean in terms of whether or not this child, whether or not there was physical abuse versus who caused it?" Mom objected to the question, which she believed called for an expert opinion. The Department responded that the question permissibly called for an opinion based on hearsay. The trial court proposed that the Department simply ask the detective for the conclusion of his investigation.

The Department asked, "[W]hat did you find in regards to whether or not the injuries to [A.N.C.'s brother] were the result of abuse or accidental?" Mom renewed her objection, and the trial court overruled it. The detective answered, "[T]he conclusion was that the injuries that [A.N.C.'s brother] had sustained were more than likely not something natural or accidental. Possibly, I mean, I should take that back. Possibly accidental, but not just a natural occurrence." The Department followed up by asking who was around A.N.C.'s brother at the time of his head trauma and whether the parents had provided any explanation.

The record does not reflect whether the trial court viewed Detective Tilson's testimony as medical or expert or neither. But regarding Mom's argument that she clearly suffered trial by ambush because of Detective Tilson's testimony, we disagree. Mom was familiar with Detective Tilson and his investigation into A.N.C.'s brother's head trauma. The Department's description of the anticipated testimony matched the testimony at trial. Assuming without deciding that the trial court erred by allowing Detective Tilson to testify to the conclusion of his investigation, we conclude that the record does not support a reversal based on Detective Tilson's testimony under

Texas Rule of Civil Procedure 193.6 because the disclosure of Detective Tilson as a witness on July 8, 2022, did not unfairly surprise or prejudice Mom. *See* TEX. R. CIV. P. 193.6(a)(2); *Spurck*, 396 S.W.3d at 215.

Dr. Spiller

When A.N.C.'s brother was examined for his head trauma, he was seen by doctors at Center for Miracles, a clinic of UT Health San Antonio's child abuse pediatrics division. When he returned for a follow-up exam, it was Dr. Spiller who discovered his rib fractures. Like Detective Tilson, Dr. Spiller was called at A.N.C.'s trial to provide historical family information. Dr. Spiller was first disclosed on July 8, 2022, as a witness who "assessed/treated injuries."

On October 7, 2022, when parties first announced ready and witnesses were sworn in, the Department informed the trial court that it was ready to call Dr. Spiller as its first witness. The parents objected because they had not received reports, records, or a curriculum vitae for Dr. Spiller. The trial court recessed trial for two months and ordered the Department to complete its expert witness discovery.

On October 14, 2022, the Department filed a supplement to its expert witness disclosure, which designated Dr. Spiller as an expert witness and included her curriculum vitae as well as images from A.N.C.'s brother's exam. It stated that the de-identified file was provided to all attorneys on August 9, 2022. The Department summarized Dr. Spiller's anticipated testimony as follows:

> The Dr. will testify to the assessed and treated injuries that lead [sic] to the reason of CPS being involved with this family.

On December 9, 2022, Mom and Dad filed a joint motion to exclude the Department's experts due to inadequate discovery. On December 12, 2022, the parties discussed their pretrial issues with the trial court. The trial court then wrote, in its unsigned notes, in relevant part:

> Petitioner is ordered to supplement its disclosure responses with the general substance of all Petitioner's experts' mental impressions and opinions with a brief summary for the basis of the opinions; to provide Respondents with documents which form the foundation of Petitioner's expert's opinions or impressions; and to produce the experts' resume(s) on or before January 20, 2023.

On January 20, 2023, the Department filed a supplement to its disclosure, which explicitly designated Dr. Spiller as an expert, provided medical documents, and described Dr. Spiller's anticipated testimony as follows:

> Dr. Spiller will testify to the medical assessment completed and the diagnosis of injuries observed.
>
> Dr. Spiller believed that severe physical abuse occurred to A.N.C.'s brother causing a brain injury and rib fractures. Dr. Harjo [, a fellow under Dr. Spiller's supervision,] believed that prior to seek [sic] medical treatment, [A.N.C.'s brother] sustained rib fractures that occurred at approximately 8 to 9 weeks of age.

On February 17, 2023, the parents filed a second motion to exclude the Department's expert testimony based on inadequate discovery. The trial court denied the motion on February 22, 2023.

When Dr. Spiller was called to testify on February 23, 2023, Mom requested and was given a running objection to Dr. Spiller's expert opinion testimony. The trial court overruled the objection, and Dr. Spiller testified to her examination of A.N.C.'s brother.

Now, Mom argues that she suffered a trial by ambush because the Department was allowed to present Dr. Spiller's testimony regarding her examination of A.N.C.'s brother. We disagree. Mom was familiar with Dr. Spiller and her examination of A.N.C.'s brother. The Department's description of Dr. Spiller's anticipated testimony matched the testimony at trial. Assuming without deciding that the trial court erred by allowing Dr. Spiller to testify to her observations and findings about A.N.C.'s brother, we conclude that the record does not support a reversal based on Dr.

Spiller's testimony under Texas Rule of Civil Procedure 193.6 because Mom could not have been surprised by it. *See* TEX. R. CIV. P. 193.6(a)(2); *Spurck*, 396 S.W.3d at 215.

Custodian of Records

On February 10, 2023, the Department disclosed a custodian of records to admit A.N.C.'s brother's medical records at trial. On February 22, 2023, the parents objected to the custodian of record's testimony due to late disclosure. The Department argued that the documents at issue were disclosed months earlier and that Mom should not be surprised that a custodian would testify to the records being kept in the regular course of business at the children's hospital. The trial court agreed and overruled the parents' objection as to any documents that were previously disclosed. The Department then used the custodian of records' testimony to admit two exhibits of previously disclosed records that amounted to approximately five pages of hospital documents.

On this record, we conclude that the trial court did not abuse its discretion in overruling the parents' disclosure objection because the parents could not have been surprised by a custodian of records testifying that previously disclosed medical records belonging to their child were kept in the regular course of business. *See* TEX. R. CIV. P. 193.6(a)(2); *Fox*, 2017 WL 626628, at *2.

### BASIS FOR TERMINATING MOM'S AND DAD'S PARENTAL RIGHTS

Mom argues the evidence was not legally or factually sufficient to support the jury's statutory ground finding under section 161.001(b)(1)(O). Mom and Dad both argue that the evidence was insufficient to support a finding that termination of their rights was in A.N.C.'s best interest.

### A.     Evidence Required, Standards of Review

The evidentiary standards[i] the Department must meet and the statutory grounds[ii] the trial court must find to terminate a parent's rights to a child are well known, as are the legal[iii] and factual[iv] sufficiency standards of review. The Department argues that Mom and Dad failed to

preserve a factual sufficiency review by omitting to file motions for new trial. *See* TEX. R. CIV. P. 324(b)(2); *In re D.T.*, 625 S.W.3d 62, 75 n.8 (Tex. 2021) (citing *In re M.S.*, 115 S.W.3d 534, 549 (Tex. 2003)). We agree and review the jury's verdicts for legal sufficiency only.

**B.      Statutory Ground Finding Required**

Generally, a single statutory ground finding, when accompanied by a best interest of the child finding, is sufficient to support a parental rights termination order. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re R.S.-T.*, 522 S.W.3d 92, 111 (Tex. App.—San Antonio 2017, no pet.). The Department argues that the evidence was sufficient to support the jury's finding under section 161.001(b)(1)(O). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *In re G.A.*, No. 10-21-00001-CV, 2021 WL 1686721, at *1 (Tex. App.—Waco Apr. 28, 2021, no pet.).

*1.  Section 161.001(b)(1)(O)*

Subsection (O) allows for termination of parental rights if the factfinder "finds by clear and convincing evidence that the parent has failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *In re Z.M.M.*, 577 S.W.3d 541, 542 (Tex. 2019). "Whether a parent has 'done enough' to comply with the court-ordered service plan under subsection (O) is generally a fact question." *In re C.A.L.*, No. 14-21-00543-CV, 2022 WL 553168, at *5 (Tex. App.—Houston [14th Dist.] Feb. 24, 2022, pet. denied) (mem. op.) (citing *In re S.M.R.*, 434 S.W.3d 576, 584 (Tex. 2014)). The factfinder should consider whether "the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent." TEX. FAM. CODE ANN. § 161.001(d); *In re G.A.*, 2021 WL 1686721, at *1.

### a. The Trial Court's Order

The Department admitted Mom's court-ordered family (or "service") plan at trial. The parties agreed that Mom completed most of what was required in the plan, including a parenting class, domestic violence class, a psychological evaluation, and individual counseling. But the Department argued that Mom failed to demonstrate that she could provide a safe and stable housing for A.N.C. as required, because 1) she had not established consistent employment and 2) she allowed Dad to live with her despite her San Antonio Housing Association lease restrictions.

Specifically, Mom's family plan required her in relevant part to: 1) "locate and maintain stable and appropriate employment that provides a stable source of legal income adequate enough to support herself and her children for a minimum of six (6) months to demonstrate stability," 2) "provide employment verification to her caseworker and will provide copies of pay stubs on a monthly basis as requested," 3) "will locate and maintain stable housing that has working utilities and is free from drugs and violence," and 4) "not associate with individuals who could harm or endanger her children in any way."

### b. Witnesses

Several witnesses testified to Mom's ability to maintain safe and stable housing for A.N.C., including Mom, her sister, and her caseworker. Regarding the weight and credibility of their testimony, we "defer to the jury's determinations, at least so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)). We now briefly recite some of their testimonial evidence.

<u>Mom</u>

Mom testified that she had maintained stable and appropriate employment by working for the same two paint contracting companies in the two months before her appearance at trial, i.e.,

since the end of December 2022. She said that she had been in that line of work—the same line of work as Dad—off and on for about five years. Later, when asked if she agreed with her sister's assessment that she had been working in contract painting for three years, she agreed.

The weekend before Mom and her caseworker testified at trial, Mom sent the caseworker two unsigned work orders for contract painting jobs. The orders did not specify which subcontractor would be completing the work or when they would occur. Mom agreed that these work orders made it difficult for the caseworker to verify her employment.

Mom testified that, at some point, she had a job as a community coach through SAHA, but the details do not appear in the record. She also stated that she "handled production materials" for a company called Endomine in September 2022. Mom stated that her income combined with Dad totaled about $24,000 in 2022 and that it was enough to pay for bills and child support for her other children.

Mom also testified that she obtained housing through the San Antonio Housing Authority and that she was not required to pay rent as a result. She admitted that she allowed Dad to live at her current residence for a year and a half without reporting him as a resident, as required by her lease with SAHA. Her prior residence was also provided through SAHA, and she allowed Dad to stay there since 2019 without reporting him as required.

Maternal Aunt

A.N.C.'s aunt corroborated Mom's testimony that she worked in contract painting and that, at some point, Mom had a job with SAHA. She also testified that she believed Mom could provide stable housing for A.N.C. and that Mom did not struggle to pay her bills.

The Caseworker

According to the caseworker, Mom was unable to provide proof of stable employment. The caseworker was under the impression that Mom was unemployed. She stated that Mom

provided one paystub for a week of work in September 2022 and two unsigned, undated work orders.

In addition, Mom's caseworker was concerned that Mom continued to allow Dad to live in her home, even though he was not on the lease and not reported as a resident to SAHA, as required by her lease. The caseworker worried that Mom's decision created a risk of eviction, especially because Dad was on domestic violence probation, and SAHA prohibited residents with a history of family violence.

c. Legal Sufficiency of the Verdict as to Section 161.001(b)(1)(O) for Mom

Considered in the light most favorable to the jury's finding, the jury could have believed Mom's caseworker that Mom provided the barest amount of proof for any employment over the duration of her case with the Department. Even Mom admitted that the proof she provided to her caseworker before trial made employment verification difficult. The jury could reasonably have disbelieved that Mom maintained any stable or consistent employment to support A.N.C., and that she had provided no evidence of a good faith effort to fulfill her employment requirement. The jury also could have believed that Mom's association with Dad threatened the stability of her housing. Because we defer to the jury's evaluation of the witnesses' testimony, we conclude that the evidence is legally sufficient to support the jury's determination that termination of Mom's parental rights was justified under Family Code section 161.001(b)(1)(O). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *In re C.A.L.*, 2022 WL 553168, at *5 (citing *In re S.M.R.*, 434 S.W.3d at 584; *In re A.D.*, 203 S.W.3d 407, 412 (Tex. App.—El Paso 2006, no pet.)).

## C. Best Interests of the Children

The Family Code statutory factors[v] and the *Holley* factors[vi] for the best interest of a child are well known. Both parents challenge the sufficiency of the evidence supporting the jury's best

interest of the child findings. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). We review the evidence regarding the child's best interest, and highlight several factors as follows:

### 1. The Child's Desires

By the time witnesses for this case testified at trial, A.N.C. was approximately twenty months old—still too young to voice his desires as to placement. "When assessing the desires of children too young to testify articulately, courts can consider their bond with their parents and prospective adoptive parents." *E.F. v. Tex. Dep't of Family & Protective Services*, No. 03-11-00325-CV, 2011 WL 6938496, at *3 (Tex. App.—Austin Dec. 30, 2011, no pet.) (mem. op.) (citing *In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.)). "[T]he fact finder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent." *In re G.C.S.*, 657 S.W.3d 114, 133–34 (Tex. App.—El Paso 2022, pet. denied) (citing *In re R.A.G.*, 545 S.W.3d 645, 653 (Tex. App.—El Paso 2017, no pet.) ("Evidence that a child is well-cared for by his foster family, is bonded to his foster family, and has spent minimal time in the presence of a parent is relevant to the best interest determination under the desires of the child factor.")).

Here, A.N.C. had lived with his foster family since he was two weeks old. Foster Mom described A.N.C. as a happy, outgoing, mischievous, and affectionate toddler. She talked about how he would tickle her toes and run away laughing and how he loved to shake hands with new people to greet them. She talked about how he loved to cuddle and kiss people.

Foster Mom testified that she has four other children and that they all love and play with A.N.C. Foster Mom and Foster Dad both stated that they are bonded with A.N.C. and fully committed to adopting him. The caseworker also testified that A.N.C. was extremely bonded to his foster placement. *See In re R.A.G.*, 545 S.W.3d at 653.

The time that A.N.C. spent with Mom and Dad occurred during supervised visits, some of which were supervised by his foster parents. When Foster Mom was asked about her observations of Mom and Dad during visits she supervised, she stated that Mom would rock or soothe A.N.C.; she would feed him, change his diapers, and play with him. According to Foster Mom, Dad also interacted with A.N.C., though not as much as Mom. At the end of the visits, A.N.C. would hug them, blow kisses, and wave goodbye.

A.N.C.'s aunt testified that A.N.C. and Mom appeared to bond during the visits that she supervised. She stated that Mom would bring a bag with diapers, toys, food, and extra clothes. Mom would feed and bathe A.N.C. A.N.C. would crawl to her, laugh, and make funny faces with her. He would give Mom kisses and fall asleep in her arms.

Similarly, A.N.C.'s aunt testified that A.N.C. and Dad were bonded. As with Mom, A.N.C.'s aunt testified that A.N.C. would crawl to Dad, laugh, and make funny faces with him, and that he would fall asleep in Dad's arms after a bath. *See E.F. v. Tex. Dep't of Family & Protective Services*, 2011 WL 6938496, at *3.

Under this factor, if A.N.C.'s desires must be contextually inferred, we cannot say that the testimonial evidence weighs heavily in favor of one party.

2.      *The Emotional and Physical Needs of the Child Now and in the Future*

"Children need permanency and stability." *In re G.M.*, No. 02-23-00061-CV, 2023 WL 4243349, at *8 (Tex. App.—Fort Worth June 29, 2023, pet. denied) (mem. op.) (citing *In re G.V., III*, 543 S.W.3d 342, 350 (Tex. App.—Fort Worth 2017, pet. denied). In weighing this factor for the child, the jury can consider past events. *See In re J.T.T.J.*, No. 13-18-00319-CV, 2018 WL 5668567, at *7 (Tex. App.—Corpus Christi–Edinburg Nov. 1, 2018, pet. denied) (mem. op.) (citing *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi 1992, writ denied)).

In this case, A.N.C.'s aunt stated that she felt that Mom could meet A.N.C.'s physical and emotional needs. She also felt that Dad had grown and matured since she first met him fifteen years earlier, and that he "knows how to keep himself from being the little kid he was before." When asked if she had ever known him to be homeless, she said no.

Foster Mom testified that Dad told her he and Mom were homeless with their oldest child for about a year and that they lived out of their vehicle at the time. The evidence showed that, at the time of trial, Mom relied on rent-free housing to support herself and her children. It also showed that she was potentially jeopardizing her housing by not complying with her lease restrictions. Additionally, Mom's employment evidence showed that her income was unpredictable and unreliable.

In contrast, Foster Mom testified that she worked as a licensed therapist and counselor. Foster Dad testified that he was employed as a peace officer for the Texas Alcoholic Beverage Commission. Foster Mom also testified that she kept A.N.C. up to date on his pediatric and dental visits and that he was evaluated by Early Childhood Intervention for any developmental delays (he had none). She stated that she notified Mom of approximately seven to ten appointments for A.N.C. and that Mom attended one.

This factor weighs in favor of the jury's best interest finding. *See In re G.M.*, 2023 WL 4243349, at *8; *In re J.T.T.J.*, 2018 WL 5668567, at *7.

3. *The Emotional and Physical Danger to the Child Now and in the Future*

Regarding emotional and physical danger to the child now and in the future, "[t]his court considers a parent's conduct before and after the Department's removal of the children." *In re H.A.J.R.*, No. 04-21-00220-CV, 2021 WL 5088734, at *4 (Tex. App.—San Antonio Nov. 3, 2021, pet. denied) (mem. op.) (citing *In re S.J.R.-Z.*, 537 S.W.3d 677, 693 (Tex. App.—San Antonio 2017, pet. denied)).

Testimony revealed that Dad had been arrested at least twice in the past for violence toward Mom, that he was on probation for domestic violence at the time of trial, and that Mom allowed him to remain in her home.

Dr. Spiller, a child abuse pediatrician, testified that Mom said she was fearful of Dad in the past. Mom and A.N.C.'s aunt denied that Mom had been fearful of Dad, except that Mom clarified she was fearful when she was being abused. Both Dr. Spiller and Detective Tilson testified that evidence showed a likelihood that Mom and Dad were responsible for A.N.C.'s brother's past head trauma.

This factor weighs in favor of the jury's best interest finding. *See In re H.A.J.R.*, 2021 WL 5088734, at *4.

### 4. Parenting Abilities

The Department acknowledged that A.N.C.'s visits with his parents went well but still expressed concern that they could not provide a safe and stable home for him. *See In re H.P.*, No. 13-16-00277-CV, 2016 WL 5846538, at *6 (Tex. App.—Corpus Christi–Edinburg Oct. 6, 2016, pet. denied) (mem. op.).

Foster Mom noticed that Dad regularly engaged with A.N.C. during the first twenty or thirty minutes before turning his attention to a shooting game on his phone. When the foster parents discussed extending visits to make up for any hours missed, Dad stated that he preferred not to because A.N.C. was a handful to keep up with.

The parents' supervised visits often took place at Peter Piper. During one visit there, A.N.C. became upset and started crying. Mom walked around the facility with him, and then brought him to where Foster Mom was sitting, stating, "I can't get him to quit crying." Dad sat at his table, coloring with markers.

Foster Mom helped Mom during that visit by taking A.N.C. outside and giving him ice chips. The three of them walked around while A.N.C. calmed down. Dad then came outside, apologizing to Mom because he had wanted to finish coloring his picture.

Foster Mom stated that she and Foster Dad usually sat away from Mom and Dad during the visits to give them time alone with A.N.C. Foster Mom noticed that Dad spent the time playing arcade games and that Mom and Dad would usually try to get A.N.C. to take a nap, though it was not a regular naptime for him.

During a visit that Foster Dad supervised, Mom returned A.N.C. to him early, stating that A.N.C. seemed fussy and warm and was probably unwell. She did not wish to extend the visit. But A.N.C. did not continue to be fussy, and a doctor's visit two days later confirmed that he was not ill.

Of the twenty-five or twenty-six visits that Foster Mom and Foster Dad supervised, Dad missed four of them. When Mom's sister supervised the visits, Foster Mom and Foster Dad drove A.N.C. to the visits. Foster Mom stated that Dad was mostly absent for those pickups and drop-offs, though A.N.C.'s aunt testified that Dad attended the visits she supervised.

Given the overall impression of Mom and Dad working together on parenting during visits, this factor weighs in favor of the jury's best interest finding. *See In re H.P.*, No. 13-16-00277-CV, 2016 WL 5846538, at *6.

5.      *Programs Available to Assist the Parents and Promote the Child's Best Interest*

Dad testified that he took three parenting classes over the course of his service plan. He clarified that one of the classes fulfilled a probation requirement. He further clarified that he struggled with enrollment when he was fulfilling his service plan requirement. He finally completed the service plan requirement two weeks before trial. He said that he learned a lot, mainly that fatherhood is about sacrifice and providing for the family. Mom also struggled to

fulfill the parenting class requirement at first but managed to complete it before trial. Both parents completed their domestic violence classes, and Mom completed her individual counseling requirement. For Mom, this factor weighs slightly against the jury's best interest finding. For Dad, it is neutral at best. Considering that Mom and Dad remained together, their collective effort and accomplishment in this area does not weigh in their favor. *See M. L. v. Tex. Dep't of Family & Protective Services*, No. 03-22-00541-CV, 2023 WL 2025710, at *7 (Tex. App.—Austin Feb. 16, 2023, no pet.) (mem. op.).

6. *Stability of the Home or Proposed Placement*

Mom testified that she lived in the same home for a year and a half and that she did not believe she would have any issue with continuing to live there. Her caseworker testified that she was concerned Mom could be evicted because she continued to allow Dad to live there, who was both not on the lease and on probation for domestic violence in violation of Mom's lease restrictions. This factor weighs in favor of the jury's best interest finding. *See In re M.C.L.*, No. 04-17-00408-CV, 2017 WL 5759376, at *4 (Tex. App.—San Antonio Nov. 29, 2017, no pet.) (mem. op.).

7. *Legal Sufficiency of the Evidence in Support of the Jury's Best Interest Findings*

In reviewing all the evidence in the light most favorable to upholding the verdicts, we conclude that it was legally sufficient to support the verdicts. The evidence showed that Mom made a stronger effort to demonstrate her capacity to parent than Dad did, but she nevertheless chose to remain with Dad, despite the potential consequences for her children.

Because we affirm the verdicts, we do not revisit Mom's conservatorship status.

## CONCLUSION

Because the trial court retained jurisdiction to render its final order, because Mom suffered no unfair surprise at trial, and because the evidence was legally sufficient to support the jury's verdicts by clear and convincing evidence, we affirm the trial court's order.

Patricia O. Alvarez, Justice

---

[i] Clear and Convincing Evidence. If the Department moves to terminate a parent's rights to a child, the Department must prove by clear and convincing evidence that the parent's acts or omissions met one or more of the grounds for involuntary termination listed in section 161.001(b)(1) of the Family Code and that terminating the parent's rights is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 261 (Tex. 2002). The same evidence used to prove the parent's acts or omissions under section 161.001(b)(1) may be used in determining the best interest of the child under section 161.001(b)(2). *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002); *In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.); *see also* TEX. FAM. CODE ANN. § 161.001(b). The trial court may consider a parent's past deliberate conduct to infer future conduct in a similar situation. *In re D.M.*, 452 S.W.3d at 472.

[ii] Statutory Grounds for Termination. The Family Code authorizes a court to terminate the parent-child relationship if, inter alia, it finds by clear and convincing evidence that the parent's acts or omissions met certain criteria. *See* TEX. FAM. CODE ANN. § 161.001(b). Here, the jury found that the parents' course of conduct met the following criteria or grounds:

> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

*Id.* § 161.001(b)(1).

[iii] Legal Sufficiency. When a clear and convincing evidence standard applies, a legal sufficiency review requires a court to "'look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.'" *In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005) (quoting *In re J.F.C.*, 96 S.W.3d at 266). If the court "'determines that [a] reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true,'" the evidence is legally sufficient. *See id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266).

[iv] Factual Sufficiency. Under a clear and convincing standard, evidence is factually sufficient if "a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d at 25; *accord In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must consider "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *In re J.F.C.*, 96 S.W.3d at 266; *accord In re H.R.M.*, 209 S.W.3d at 108.

[v] Statutory Factors for Best Interest of the Child. The Texas legislature codified certain factors courts are to use in determining the best interest of a child; the factors are listed in the statute. TEX. FAM. CODE ANN. § 263.307(b).

[vi] *Holley* Factors. The Supreme Court of Texas identified several nonexclusive factors to determine the best interest of a child in its landmark case *Holley v. Adams*. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *accord In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012) (reciting the *Holley* factors).